THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:

DATED: April 12, 2018



Susan V. Kelley
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re<br>University of Wisconsin<br>Oshkosh Foundation, Inc.,<br>               Debtor. | Chapter 11<br><br>Case No. 17-28077-svk |
| University of Wisconsin<br>Oshkosh Foundation, Inc.,<br>               Plaintiff,<br><br>v.<br><br>The Board of Regents of the<br>University of Wisconsin System,<br>               Defendant. | Adversary No. 17-02302 |

**DECISION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

This Chapter 11 bankruptcy case started when the State of Wisconsin refused to honor financial commitments made to the University of Wisconsin Oshkosh Foundation, Inc. by the former Chancellor and Vice Chancellor of the University. The Foundation filed this adversary proceeding against the State (acting through the Board of Regents of the University of Wisconsin System) to enforce the commitments as property of the bankruptcy estate. The State responded with a motion to dismiss, claiming that any obligations allegedly due from the State are void

under the Wisconsin Constitution.  The Court denied the motion to dismiss, finding an applicable exception in the constitution for "public debt."  (Docket No. 18.)  The State then filed a motion for summary judgment.  After briefing, the Court heard oral argument on April 5, 2018.  For the reasons stated at the hearing and set forth in this Decision, the Court denies the motion in full.

The following facts are undisputed.  The University Chancellor and Vice Chancellor for Administrative Services signed three memoranda of understanding (the "MOU") reciting various benefits that the Foundation provided to the University.  In consideration, the University agreed that it would cover any deficit incurred by the Foundation on certain construction projects and any deficit incurred in the payment of debt service and operational expenses on two biodigester facilities.[1]  The Vice Chancellor also signed several letters agreeing to make debt service payments to banks in the event the Foundation was unable to do so.  Deborah Durcan, the Vice President of Finance for the University of Wisconsin System, was present when the Chancellor

---

[1] The language reads:

> . . . the University agrees that if revenues from projects and initiatives taken on by the Foundation are not sufficient to cover project/program expenses, the University will cover any deficit that is incurred by the Foundation in support of said projects.  Furthermore, the University agrees to compensate and make whole, on an annual basis, the Foundation for any cost overruns attendant to the above referenced projects and initiatives.  (Complaint, Exhibit A, Docket No. 1-1 at 1.)

> . . . the University agrees, that if the revenues from the operation of the Facility [the Witzel biodigester facility] are insufficient to service the operational budget and debt service on the loan, that the University will cover any deficit that is incurred by the Foundation in support of the operations of the Facility and the payment of debt service.  (Complaint, Exhibit F, Docket No. 1-1 at 6.)

> . . . the University agrees, that if the revenues from the operation of the Facility [the Rosendale Dairy biodigester facility] are insufficient to service the operational budget and debt service on the loan, that the University will cover any deficit that is incurred by the Foundation in support of the operations of the Facility and the payment of debt service. The University will also fund any sunk costs incurred by the Foundation if the Facility would not be completed.  (Complaint, Exhibit H, Docket No. 1-1 at 8.)

Among the projects that were built in reliance on the MOU was an Alumni Welcome and Conference Center.

and Vice Chancellor made their promises to the Foundation, and she did not object to the MOU or comfort letters. (Docket No. 13-1 at 10.)

The complaint contains claims for breach of contract, a declaratory judgment as to the enforceability of the MOU and alleged guaranties, misrepresentation, breach of the duty of good faith and fair dealing, unjust enrichment, and promissory estoppel. The Foundation's opposition to the motion clarifies that the causes of action in the proceeding are claims brought under § 542 of the Bankruptcy Code for turnover of property of the Foundation's bankruptcy estate. (Docket No. 29.) The motion asserts that the Foundation's breach of contract claim must fail because the alleged contracts violate the Wisconsin Constitution and are unenforceable. Because Wisconsin law prohibits the contracts, the Foundation could not succeed on a restitution claim or obtain another remedy. The State also argues that sovereign immunity bars all of the Foundation's claims.

Summary judgment is appropriate if the pleadings and affidavits on file show there is no genuine dispute as to any material fact and the moving party can establish it is entitled to judgment as a matter of law. *See* Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56; *Omega Healthcare Inv'rs, Inc. v. Res-Care, Inc.*, 475 F.3d 853, 857 (7th Cir. 2007). Material facts are "facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, the Court views all facts and draws all inferences in the light most favorable to the non-moving party. *Omega Healthcare*, 475 F.3d at 857.

The State argues that it is entitled to summary judgment on the Foundation's breach of contract claim because the agreements allegedly created in the MOU are void under the public debt provisions of Article VIII of the Wisconsin Constitution. The State claims that to qualify as

3

public debt, an obligation must conform to the requirements of Chapter 18 of the Wisconsin Statutes and meet that chapter's definition of "public debt." However, § 18.14 provides a sweeping savings clause validating debt not contracted in compliance with the relevant procedures:

> Notwithstanding any defects, irregularities, lack of power or failure to comply with any statute or any act of the commission, all public debt contracted or attempted to be contracted after December 7, 1969 is declared to be valid and entitled to the pledge made by s. 18.12; all instruments given after December 7, 1969 to evidence such debt are declared to be binding, legal, valid, enforceable and incontestable in accordance with their terms; and all proceedings taken and certifications and determinations made after December 7, 1969 to authorize, issue, sell, execute, deliver or enter into such debt or such instruments are validated, ratified, approved and confirmed.

Wis. Stat. § 18.14.

To qualify for the broad protection of § 18.14, the debt must meet the definition of "public debt." According to Wis. Stat. § 18.01(4), "public debt" "means every voluntary, unconditional undertaking by the state, other than an operating note, to repay a sum certain: (a) Out of the state treasury, except a loan or advance by any state agency or fund to any other state agency or fund . . . ." The agreements in the MOU were unconditional. Nothing was required to trigger the University's obligation to cover a deficit incurred by the Foundation on the building projects. The MOU also were for a sum certain, as the parties were aware of the ceiling on the University's payment obligation based on the bonds issued. Like the amount owed on an ordinary promissory note, the amount of the debt on a specific date would need to be computed, but the Foundation could readily make the computation. Wisconsin law supports the conclusion that the MOU represent debt with the requisite certainty. In *Koshick v. State*, 2005 WI App 232, ¶ 12, 287 Wis. 2d 608, 616, 706 N.W.2d 174, 178, the court determined a concert promoter's claims did not qualify as a debt:

4

> Koshick's breach of contract claim is plainly not an action on a debt. He is not seeking an amount due for goods or services that he has sold or delivered to the State; he is not, as was the plaintiff in [*Trempealeau County v. State*, 260 Wis. 602, 51 N.W.2d 499 (1952)], seeking money that the State has received that he asserts he is entitled to. The lost profits and the incurred expenses he seeks to recover are not liquidated; they cannot be readily determined from the terms of the alleged contract or from fixed data or mathematical computation.

Since the State's obligations under the MOU can readily be determined from fixed data or a mathematical calculation, the obligations fit within the definition of public debt. Therefore the protections of § 18.14 validate the obligations, even though the parties did not comply with the provisions of Chapter 18, such as the requirement that the State Building Commission adopt an authorizing resolution.

The State urges the Court to interpret § 18.14 as a transitional provision between 1969, when the Wisconsin Constitution was amended to permit the State to incur public debt, and 1973, when statutory revisions replaced the Wisconsin Bond Board with the State Building Commission. According to the State, the purpose of § 18.14 is to ensure that any debt incurred under the old procedures would remain valid, and any other reading would render the requirements of Chapter 18 optional and would be absurd. The State notes that the Wisconsin Supreme Court "has repeatedly held that a statute should not be construed so as to work an absurd result even when the language seems clear and unambiguous." *Worachek v. Stephenson Town Sch. Dist.*, 270 Wis. 116, 124, 70 N.W.2d 657, 661 (1955).

But on its face, § 18.14 does not work an absurd result as a permanent savings provision. Chapter 18 provides procedures that the State must follow in contracting public debt. Section 18.14 provides assurance to the other party to an agreement that public debt will be valid even if the State fails to comply with Chapter 18's procedures. With millions of dollars of bonds and

5

other obligations at stake, the State's obligees and partners in the issuance of public debt would reasonably insist on comprehensive protection from potential clerical and other errors.

And the State's inference about the transitional purpose of the statute rests on pure speculation about what the legislature intended. The plain language of § 18.14 is susceptible to only one interpretation: the provision is permanent. The State cites no legislative history supporting its position, and the Court's review of the legislative drafting files turned up no evidence suggesting the provision was intended to sunset when the pre-1973 obligations were paid in full. *See State ex rel. Kalal v. Circuit Court for Dane Cty.*, 2004 WI 58, ¶ 51, 271 Wis. 2d 633, 666-67, 681 N.W.2d 110, 126 (under Wisconsin precedent, "legislative history is sometimes consulted to confirm or verify a plain-meaning interpretation.").

Moreover, another chapter of the Wisconsin Statutes references § 18.14. Section 946.13 prohibits public officers and employees from taking a private interest in a public contract. Although contracts entered into in violation of the section are void, the statute makes an exception for "contracts creating a public debt, as defined in s. 18.01 (4), if the requirements of s. 18.14 (1) have been met." Wis. Stat. § 946.13(6). The legislature has amended § 946.13 multiple times since 1973, including as recently as 2009, exposing a fatal flaw in the State's argument that the legislature has overlooked problems with the temporal scope of § 18.14 for over forty years.

The Court is necessarily mindful that "[j]udicial deference to the policy choices enacted into law by the legislature requires that statutory interpretation focus primarily on the language of the statute." *Kalal*, 2004 WI 58, ¶ 44. This is especially true in the absence of any indication of the legislature's intent other than the plain language of the statute. The modern view of the absurdity doctrine fully supports this curb on statutory construction. According to Judge

6

Easterbrook, under recent Supreme Court holdings, the absurdity doctrine is "linguistic rather than substantive," "draw[ing] a line between poor exposition and benighted substantive choice; the latter is left alone, because what judges deem a 'correction' or 'fix' is from another perspective a deliberate interference with the legislative power to choose what makes for a good rule." *Jaskolski v. Daniels*, 427 F.3d 456, 462 (7th Cir. 2005). Under this view, the savings clause provided by § 18.14 is not absurd, and this Court should not substitute its judgment for that of the legislature, which unambiguously chose to protect from challenge public debt agreements that did not "dot every i and cross every t."

The State also maintains that its sovereign immunity bars all of the Foundation's claims. The Foundation counters that the State waived sovereign immunity by its litigation conduct in not raising the defense in its earlier motion to dismiss, or by consenting to this Court's entry of a final order. Even if the Court does not accept the waiver argument, the Foundation relies on § 106 of the Bankruptcy Code to abrogate the State's sovereign immunity defense.

To support its waiver argument, the Foundation cites *Kenosha v. State*, 35 Wis. 2d 317, 151 N.W.2d 36 (1967) which held that sovereign immunity is a "personal-jurisdiction defense" which must be raised or is deemed waived and that an individual state officer who had merely entered a general demurrer to a complaint for declaratory judgment had waived his immunity from suit. However, the State's sovereign immunity in federal court under the Eleventh Amendment occupies its own sphere. Unlike subject matter jurisdiction, this sovereign immunity is waivable, but a court may consider the defense even if no party raises it. *See Floyd v. Thompson*, 227 F.3d 1029, 1035 (7th Cir. 2000). The Court's research uncovered no clear examples enforcing Federal Rule of Civil Procedure 12(h)(1) against raising sovereign immunity as a defense when it was not included in an initial motion to dismiss. The Court concludes that

7

any waiver should be explicit and unambiguous and that, at this early stage of the litigation, the Court should properly consider whether sovereign immunity bars the Foundation's suit, despite the fact that it was not raised in the State's prior motion.

The State's consent to this Court's entry of a final order or judgment likewise did not serve to waive the State's sovereign immunity. Rather, this consent merely established that as to the non-core claims raised in the complaint, this Court can enter a final, appealable order, rather than proposed findings of fact and conclusions of law for consideration by the District Court. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015); Fed. R. Bankr. P. 7012(b). The State's consent is completely distinguishable from the consent to federal jurisdiction evidenced by the filing of a proof of claim. *See, e.g., Bulk Petroleum Corp. v. Ky. Dep't of Revenue (In re Bulk Petroleum Corp.)*, 796 F.3d 667, 679-80 (7th Cir. 2015) (noting the Eleventh Amendment did not bar a debtor's suit against a state when the state filed a proof of claim and "sought an affirmative recovery."). The State has not filed a proof of claim in the Foundation's case and has not waived its sovereign immunity defense.

Since the defense has not been procedurally waived, the inquiry is whether the State's Eleventh Amendment immunity bars the Foundation's claims. In *Central Virginia Community College v. Katz*, 546 U.S. 356 (2006), the Supreme Court determined that a bankruptcy trustee's action to recover a preferential transfer made to a state agency was not barred. In so holding, the Supreme Court relied not on Congress's purported abrogation of sovereign immunity in § 106 of the Bankruptcy Code, but rather on a theory that the states agreed not to assert sovereign immunity in limited circumstances when they ratified the Bankruptcy Clause at the Constitutional Convention. In doing so, states have "acquiesced in a subordination of whatever

8

Case 17-02302-svk    Doc 32    Filed 04/12/18    Page 8 of 11

sovereign immunity they might otherwise have asserted in proceedings necessary to effectuate the *in rem* jurisdiction of the bankruptcy courts." *Id.* at 378.

The Supreme Court identified three "critical features" of bankruptcy proceedings: "the exercise of exclusive jurisdiction over all of the debtor's property, the equitable distribution of that property among the debtor's creditors, and the ultimate discharge that gives the debtor a 'fresh start' by releasing him, her, or it from further liability for old debts." *Id.* at 363-64. This case involves the first feature: property of the bankruptcy estate. A turnover action is a proceeding to collect property of the estate. As such it qualifies as the type of in rem proceeding contemplated by the Supreme Court in *Katz* because it involves the bankruptcy court's jurisdiction over property of the estate and the collection of that property for distribution among creditors. Other courts agree. In *Kids World of America, Inc. v. Georgia (In re Kids World of America, Inc.)*, 349 B.R. 152, 165-66 (Bankr. W.D. Ky. 2006), the court observed:

> As determined, *supra*, this is more properly considered as being in the nature of an action for turnover. As the Supreme Court found in *Katz* when it was similarly faced with an action for turnover, this is unquestionably an action arising under one of the "laws on the subject of Bankruptcies" for which the framers of the Constitution did not intend sovereign immunity to extend. Therefore, the Defendant is subject to this Court's jurisdiction and cannot, in light of *Katz*, successfully assert sovereign immunity.

Here, the Foundation's rights under the MOU are property of the estate subject to a turnover action. Under *Katz*, the State cannot assert its sovereign immunity as a defense to this action.

The State cites *In re Equipment Acquisition Resources, Inc.*, 742 F.3d 743 (7th Cir. 2014) ("*EAR*") for the proposition that § 106 does not subject the State to state law claims that could not be asserted outside of bankruptcy.[2] But *EAR* did not involve a turnover action under § 542. In *EAR,* the debtor in possession, using the powers of the bankruptcy trustee, sought to recover

---

[2] The State does acknowledge, however, that under *Koshick*, 2005 WI App 232, the State consented to certain breach of contract suits.

9

nine fraudulent transfers, eight under the two-year lookback of Bankruptcy Code § 548, and one under the longer lookback period under Illinois law. *See id.* at 745 (observing that Illinois "has adopted the Uniform Fraudulent Transfer Act, which has a four-year statute of limitations."). Importantly, only the ninth transfer was at issue in the case, as the IRS agreed to "disgorge the eight payments that EAR could recover using § 548." *Id.* The longer lookback period is available to trustees under Bankruptcy Code § 544(b), under which

> [T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

In explaining § 544(b), the Court of Appeals noted that the provision "by its very terms" requires a plaintiff to show that an unsecured creditor could use a state's applicable law to recover the transfer. *EAR*, 742 F.3d at 747. Since there was no creditor who could overcome the sovereign immunity defense, the ninth transfer was not avoidable under § 544. But the IRS did not even assert its sovereign immunity defense against recovery of the eight transfers under the Bankruptcy Code's fraudulent transfer provision. This concession is understandable as the § 548 claims arise under the in rem jurisdiction of the bankruptcy court, as to which, according to *Katz*, the states have waived their sovereign immunity. As an action to recover property of the estate, the claims in this case are analogous to the § 548 claims in *EAR,* not the § 544(b) claim. *EAR* is therefore distinguishable, and the Foundation is able to assert its claims against the State.

The State also argues that if the MOU are unenforceable either under the Wisconsin Constitution or for failure to follow the procedures of Chapter 18, then the Court should leave the parties where it finds them. (Docket No. 5.) But as the Court determined in deciding the motion to dismiss, even if the MOU are void, the Foundation would have a claim for restitution if it was not in pari delicto with the other party to the void contract. *See Hiltpold v. T-Shirts*

10

*Plus, Inc.*, 98 Wis. 2d 711, 717, 298 N.W.2d 217, 220 (Ct. App. 1980) ("[A] party not in pari delicto may have restitution of benefits conferred under an illegal contract."). The Foundation's claim for restitution also would be estate property. *See* 11 U.S.C. § 541; *In re Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993), *abrogated on other grounds by Law v. Siegel*, 134 S. Ct. 1188 (2014) (stating "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541."). Therefore, whether the Foundation is seeking to recover under the MOU or seeking restitution in the event the MOU are determined to be void, the Foundation's claims involve turnover of property of the bankruptcy estate, and the State's Motion based on sovereign immunity must be denied.

In conclusion, the Court determines that the MOU constitute public debt as defined in § 18.01(4) of the Wisconsin Statutes; § 18.14 validates the debt; and under *Katz*, the State has waived its sovereign immunity as a defense in this turnover action. Accordingly,

IT IS THEREFORE ORDERED: the State's Motion for Summary Judgment is denied.

#####