UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re | Chapter 11 |
| University of Wisconsin | |
| Oshkosh Foundation, Inc., | Case No. 17-28077-svk |
| Debtor. | |

| | |
|---|---|
| University of Wisconsin | |
| Oshkosh Foundation, Inc., | |
| Plaintiff, | |
| v. | Adversary No. 17-02302 |
| The Board of Regents of the | |
| University of Wisconsin System, | |
| Defendant. | |

**MEMORANDUM DECISION GRANTING IN PART
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

This motion for partial summary judgment filed by the University of Wisconsin Oshkosh

Foundation, Inc. presents the central question in the Foundation's bankruptcy case: whether the

State of Wisconsin is liable to the Foundation based on assurances the University of Wisconsin

Oshkosh[1] gave to the Foundation. As both parties recognize, this is a breach of contract case,

and the outcome turns on whether the contracts at issue violate the Wisconsin Constitution and

are thus void and unenforceable.

I.      FACTUAL AND LEGAL BACKGROUND

The University's former Chancellor, Richard Wells, wanted to pursue several projects,

including the construction of two biodigesters and a welcome and conference center. (Docket

---

[1] The Foundation brought this adversary proceeding against the Board of Regents of the University of Wisconsin
System. The Board of Regents is the State administrative agency responsible for governing the University of
Wisconsin System. *See* Wis. Stat. §§ 15.91, 36.09. This decision will refer to the "State" as the party to the
proceeding. It will refer to the University of Wisconsin Oshkosh as the "University" in discussion of actions taken
by officers of the University of Wisconsin Oshkosh.

No. 37-2 ¶ 2; the "Mulloy Affidavit.")  Because of significant University budget cuts, "the Board of Regents encouraged UW campuses to become more entrepreneurial to make do with less." (*Id.* ¶ 4.d.)  Part of this effort involved enlisting the Foundation's financial support to fund the desired projects.  (*Id.*)

The parties structured the transactions so that the Foundation would incur the debt to fund the projects.  The Chancellor and Thomas Sonnleitner, the University's former Vice Chancellor for Administrative Services, signed several memoranda of understanding in favor of the Foundation (the "MOU").  In the MOU, the University agreed  to cover any deficit incurred by the Foundation on the construction projects, as well as any deficit incurred in the payment of debt service and operational expenses of the biodigesters.  Both the Chancellor and Vice Chancellor stated at a Foundation board meeting that they had authority to guarantee debts the Foundation would incur.  (Mulloy Affidavit ¶ 8.)  Deborah Durcan, the Vice President of Financial Affairs for the University of Wisconsin System, was present when the Chancellor and Vice Chancellor made their promises to the Foundation, and she did not dissent or raise any concern about the guaranties.  (*Id.* ¶ 8.c.)  The University also provided guaranties to lenders. The Vice Chancellor signed several letters agreeing that the University would make debt service payments in the event the Foundation was unable to do so.  According to bank officers, the banks relied on these promises in extending credit to the Foundation.  (Docket Nos. 37-4 and 37-5.)

The University and UW-Oshkosh Foundation Rosendale Biodigester, LLC, an LLC the Foundation created to own one of the biodigesters, also entered into a use agreement allowing the University to use the biodigester as a student laboratory.  Under the terms of the agreement, the University agreed to pay rent to the LLC, which would assist it in meeting its financial

obligations.  (Docket No. 37-2 at 13-15.)  The University Vice Chancellor signed the use agreement.

When the Foundation was unable to pay its debts, in part because the revenues from the biodigesters did not meet expectations, the Foundation requested that the University honor its commitments.  (Mulloy Affidavit ¶¶ 20-21.)  The University refused, and the Foundation ultimately filed this Chapter 11 case.  As summarized in the Court's prior decision denying the State's motion for summary judgment,[2] the Foundation filed this adversary proceeding against the State to enforce the commitments as property of the bankruptcy estate.  The State responded with a motion to dismiss, claiming that any obligations allegedly due from the State are void under the Wisconsin Constitution.  The Court denied the motion to dismiss, finding an applicable exception in the constitution for "public debt."  (Docket No. 18.)  The State then filed a motion for summary judgment, which the Court also denied.

The Foundation has now filed the instant motion for partial summary judgment.  It seeks judgment on its breach of contract claim, arguing that the University breached enforceable obligations established in (1) the MOU between the University and the Foundation; (2) guaranties made by the University to banks; and (3) the use agreement between the University and the LLC that owned the Rosendale biodigester.  According to the Foundation, the Court should use its equitable powers to include attorneys' fees and professional fees in any award. The Foundation also requests that the Court enter final judgment on the breach of contract claim pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, incorporated in adversary proceedings by Bankruptcy Rule 7054.  (Docket No. 39 at 1.)  The State does not take issue with

---

[2] *Univ. of Wis. Oshkosh Found., Inc. v. Bd. of Regents of the Univ. of Wis. Sys. (In re Univ. of Wis. Oshkosh Found., Inc.)*, 586 B.R. 458 (Bankr. E.D. Wis. 2018) (Docket No. 32).

the operative facts stated by the Foundation, but vigorously denies that the Foundation is entitled to a judgment based on applicable law.

II.     JURISDICTION

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b) and the order of reference from the district court entered pursuant to 28 U.S.C. § 157(a).  The State does not dispute that this is a core proceeding that the Court may hear and determine under 28 U.S.C. § 157(b)(2)(E) and (O) as a proceeding for turnover of property of the bankruptcy estate and a proceeding affecting the adjustment of the debtor-creditor relationship.  Although the claims in the Complaint are statutorily core proceedings, the bankruptcy court is constitutionally prohibited from finally determining some of them without the parties' consent.  *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015); *Stern v. Marshall*, 564 U.S. 462 (2011). However, the State consented to entry of final judgment by this Court.  (Docket No. 4 at 1.)

III.    DISCUSSION

The parties agree that this is a breach of contract action.  The State concedes that the MOU formed a contract between the Foundation and the University, stating that "this is not a circumstance where the Court needs to analyze whether there was an offer, acceptance, and consideration, or a meeting of the minds."  (Docket No. 38 at 3.)  Rather, the State contends that the contracts are legally unenforceable because the Wisconsin Constitution prohibits guaranties of the type established in the MOU.[3]  The State makes the same arguments that the Court

---

[3] In previous proceedings, the State asserted that sovereign immunity barred certain claims asserted by the Foundation.  The State no longer asserts this argument for purposes of the present motion.  Docket No. 38 at 9 n.10:
> Because suit against the State is possible if certain conditions-precedent are met, the State waived asserting compliance with these conditions-precedent as a means to expediting the resolution of this case. As to all claims the Foundation has raised in this case, *other than the breach of contract claim*, the Board of Regents maintains that the State has sovereign immunity from suit for the reasons set forth in its briefs in support of summary judgment. (Dkt. 26:10-17; Dkt. 30:1-8.)

4

considered and rejected in denying its motion for summary judgment, and the Court again rejects them for the same reasons.

A. <u>Summary judgment standard.</u>

Summary judgment is appropriate if the pleadings and affidavits on file show there is no genuine dispute as to any material fact and the moving party can establish it is entitled to judgment as a matter of law. *See* Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56. Material facts are "facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, the Court views all facts and draws all inferences in the light most favorable to the non-moving party. *Id.* at 255.

B. <u>The MOU are valid, enforceable contracts.</u>

The Wisconsin Constitution permits the State to "contract *public debt* . . . [t]o acquire, construct, develop, extend, enlarge or improve land, waters, property, highways, railways, buildings, equipment or facilities for public purposes." Article VIII, Section 7(2)(a) (emphasis added). There is no question that the construction of facilities designed to serve the University's students and the surrounding community serves a public purpose. The biodigester facilities signified a move towards the use of renewable resources and provided educational opportunities for students, and the welcome and conference center enhanced the campus. Rather, the State argues that the obligations incurred in the MOU are not "public debt" because they do not satisfy the definition of public debt in enabling legislation, and the University did not follow appropriate statutory procedures in entering into the MOU. According to the State, these deficiencies render the agreements void and unenforceable.

Relevantly for the purpose of this adversary proceeding, section 18.01(4) of the Wisconsin Statutes defines "public debt" as "every voluntary, unconditional undertaking by the state, other than an operating note, to repay a sum certain. . . ." Two requirements are disputed here: whether the MOU commit the State to an "unconditional undertaking" for a "sum certain." As the Court previously determined, the MOU meet both of these criteria, at least as to a portion of the damages claimed by the Foundation. Further, because of a savings provision contained in the statute, the State's failure to follow the contracting procedures of Chapter 18 does not affect the enforceability of the debt.

### C. The State's undertaking was unconditional and for a sum certain.

The three transactions followed a similar structure, although the exact sequence of events varied. The undisputed goal of the transactions was for the Foundation to finance projects benefitting the University. The Foundation created and is the sole member of three single-purpose LLCs that own the welcome and conference center and the two biodigesters.[4] The LLCs, in one case in conjunction with the Foundation, executed promissory notes in favor of the City of Oshkosh and Town of Rosendale, which the municipalities funded through issuing bonds. The Foundation provided guaranties to several banks, which purchased the bonds, and the notes were assigned to the banks.

To help facilitate the transactions, the University provided assurances of payment to both the Foundation and to the banks. Two MOU from the Chancellor and Vice Chancellor to the Foundation recited various benefits that the Foundation provided to the University and agreed that in consideration, the University would cover any deficit the Foundation incurred in the operation of the biodigester facilities and the payment of debt service. The third MOU was a

---

[4] For convenience, UW-Oshkosh Foundation-Witzel, LLC will be referred to as "Witzel Biodigester, LLC" and UW-Oshkosh Foundation Rosendale Biodigester, LLC will be referred to as "Rosendale Biodigester, LLC."

6

blanket MOU under which the University agreed to cover any deficit incurred by the Foundation in support of projects the Foundation financed for the University, including property acquisition and renovation, construction, research and curriculum enhancement programs, and green initiatives. The University also provided guaranties to the banks, agreeing to make the required debt service payments on the bonds should revenues from the biodigester projects be insufficient to service the operational budget and debt service or should the Foundation be unable to raise the pledges necessary to service the welcome and conference center debt.

The University's obligation to the Foundation as evidenced by the MOU was both unconditional and for a sum certain. No contingency needed to occur to trigger the University's liability to the Foundation. Additionally, the amount of the University's liability to the Foundation was fixed by the Foundation's liability to the lenders. The amount of the University's guaranties to the banks matched the Foundation's liability as a guarantor or a borrower in the transactions. However, to the extent the MOU purported to obligate the University to cover operating deficits and expenses of the biodigesters, the obligations do not constitute sums certain, and do not fall within the definition of public debt.

        1.    *The Witzel Biodigester*

As part of the Witzel biodigester transaction, a letter to Wells Fargo Securities, LLC ("Wells Fargo") dated September 22, 2010 and signed by the Vice Chancellor recited that the City of Oshkosh would issue $3.7 million in bonds, to be purchased by Wells Fargo. In the letter, the University agreed "that if the revenues from operation of the Facility are insufficient to service the operational budget and debt service on the Bonds, that the University will support the operations of the Facility and the payment of debt service on the Bonds." (Docket No. 37-2 at 17.) The Foundation and the Witzel Biodigester, LLC signed a promissory note agreeing to pay

the debt.  (An unexecuted copy of the note and assignment to Wells Fargo appears at Docket No. 37-2 at 25-27.)

The June 2012 MOU signed by the Chancellor and Vice Chancellor confirms the University's commitments to pay for the Witzel biodigester.  In that MOU, the University agreed

> that if the revenues from the operation of the Facility [the Witzel biodigester facility] are insufficient to service the operational budget and debt service on the loan, that the University will cover any deficit that is incurred by the Foundation in support of the operations of the Facility and the payment of debt service.

(Docket No. 37-2 at 10; the "Witzel Biodigester MOU.")

Focusing on this portion of the text, the Witzel Biodigester MOU constitutes the University's agreement to cover payment of the debt service to Wells Fargo on the $3.7 million note.  This obligation was both unconditional and for a sum certain.  Nothing was required to trigger the State's obligation.  The Court rejects the State's argument that the obligation was "conditioned" on "deficits of the Foundation." (Docket No. 38 at 5.)  The State's liability under the MOU was absolute and unconditional, and was not subject to conditions precedent such as the bank's notice of default or unsatisfied collection efforts against the Foundation.  The amount of the State's liability may have been limited by the amount of operational deficits, but that is not the same as finding that the State's commitment was conditional as opposed to absolute.

The State's obligation to cover the debt service also is a "sum certain."  The debt service liability is fixed by the terms of the note.  The balance due can be readily determined by mathematical calculation, as demonstrated by the affidavit of Martin Cowie, the Foundation's chief financial officer.  He used a billing statement from Wells Fargo to determine the amount currently owing, $1,676,000.  (Docket No. 37-3 at ¶¶ 4.d. and 11.a; "Cowie Affidavit.")

Section 18.07(1) of the Wisconsin statutes declares that notwithstanding any provision of the definition of negotiable instrument in section 403.104 to the contrary, all written promises to

pay a public debt are negotiable instruments. *See* Wis. Stat. § 18.01(3) (defining "evidence of indebtedness"). Because of this declaration, Uniform Commercial Code definitions are relevant, but not binding, in construing the definition of "public debt." According to section 403.104, "negotiable instrument" means an "unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order" if certain conditions apply. The $3.7 million note on the Witzel biodigester certainly meets the definition of negotiable instrument, and the University's promise to pay that note in the MOU (by agreeing to cover "debt service") is an unconditional promise to pay a fixed amount of money and a "sum certain." The amount was readily determinable at the time the MOU was entered into and is easily calculated today. Accordingly, the obligation in the MOU to pay this note meets the definition of public debt in section 18.01.

In briefing, the State focuses primarily on the part of the MOU that refers to servicing the Foundation's operational budget and fails to address directly the argument that as to the agreement to cover debt service, the original promissory note determined the amount of the obligation. (Docket No. 38 at 3-5.) (The State also fails to cite any authority supporting its understanding of the meaning of "sum certain" as used in the definition of "public debt.") In contrast to the University's agreement to pay the Wells Fargo note, the Court agrees that the amount of the obligation established in the agreement to cover operating deficits is not readily determinable. On the date the MOU was signed, the amount of this obligation was purely speculative. Now, Mr. Cowie has calculated this amount as $973,174.69. (Cowie Affidavit, ¶ 11.b.) Apparently, the amount includes loans the Foundation made to Witzel Biodigester, LLC "to pay operating costs and debt payments," as well as reimbursements made from the LLC to the Foundation. (*Id.*) Unlike with respect to the Wells Fargo note, the total amount of the

State's potential liability was open-ended and could not readily be established from the face of the document. *See Koshick v. State*, 2005 WI App 232, ¶ 12, 287 Wis. 2d 608, 616, 706 N.W.2d 174, 178 (denying concert promoter's claims against the State because "[t]he lost profits and the incurred expenses he seeks to recover are not liquidated; they cannot be readily determined from the terms of the alleged contract or from fixed data or mathematical computation."). Therefore, the Court concludes that the obligation to reimburse the Foundation's operating deficits on the Witzel biodigester was not a sum certain. As a result, the operating deficit obligation is not a public debt entitled to the protections of section 18.14.

        2.    *The Rosendale Biodigester*

The Rosendale biodigester transaction was similar to the Witzel biodigester transaction, and the Court reaches the same conclusions as to the nature of the State's obligations as a public debt. In a June 2012 MOU signed by the Chancellor and Vice Chancellor, the University agreed

> that if the revenues from the operation of the Facility [the Rosendale biodigester facility] are insufficient to service the operational budget and debt service on the loan, that the University will cover any deficit that is incurred by the Foundation in support of the operations of the Facility and the payment of debt service.

(Docket No. 37-2 at 11; the "Rosendale Biodigester MOU.") As contemplated, Rosendale Biodigester, LLC borrowed the funds to construct the facility and then sought to refinance the debt. In a November 19, 2015 letter to First Business Bank signed by the Vice Chancellor, the University agreed that "if the revenues from the operation of the Facility are insufficient to service the operational budget and debt service on the Bonds . . . the University will support the operations of the Facility, the payment of debt service on the Bonds and any other liability owed by the Borrower to the Purchaser." (Docket No. 37-2 at 21.) The letter stated that it used terms as defined in the bond agreement. In December 2015, Rosendale Biodigester, LLC executed a promissory note for $6,771,096.01, which was assigned to First Business Bank. (Docket No. 37-

10

2 at 28-30.) The Foundation guaranteed this debt. (Docket No. 37-2 at 31-40.) The amount of the State's obligation was clearly set by the amount of the bond issuance, the promissory note and the Foundation's guaranty, and the obligation was not conditioned on the occurrence of any event. According to Mr. Cowie's affidavit, counsel for First Business Bank provided a payoff amount for the note, including principal, interest through April 20, 2018, late charges and fees. (Cowie Affidavit ¶ 4.a.) The Affidavit states that this amount is $7,708,841.32. (*Id.* ¶ 9.) This amount is a "sum certain" that was readily calculable from the face of available documents at the time of the transaction. The note bears the elements of negotiability under the U.C.C., and the obligation to cover the note payments under the MOU constitutes a public debt.

Like the Witzel Biodigester MOU, the Rosendale Biodigester MOU contained a promise that the University would cover any deficit the Foundation incurred in support of the operations of the biodigester. This amount totals $1,212,800 and represents loans made "to cover costs of operating the biodigester, such as paying payroll and other ordinary operating expenses, as well as debt payments." (Cowie Affidavit ¶ 9.b.) These obligations, which were not liquidated nor ascertainable at the time the University entered into the transaction, are not sums certain and do not qualify as public debt.

Mr. Cowie's affidavit also includes $678,000 in unsecured liability to "Bioferm." (*Id.* ¶ 9.d.) As explained in the affidavit, "this amount represents the balance of a no-interest agreement the Foundation assumed. The original agreement was between the University and Bioferm to pay for costs incurred to put the Rosendale Biodigester online and compensate Bioferm for its assistance operating the biodigester." (*Id.*) A letter dated December 20, 2012 from the Bioferm president to the University and signed by the Vice Chancellor indicated that the parties were unable to finalize plans for payment of the contract balance but concurred in

11

their "mutual intent to proceed in good faith to develop such plans and procedures for the recovery of the margin." (Docket No. 37-2 at 23.) In a letter dated September 19, 2016 from the Foundation's chairman to BioFerm USA, Inc., the Foundation stated it would assume the University's obligation. (Docket No. 37-2 at 49.) The Foundation contends that the Rosendale Biodigester MOU extends to this amount as a debt relating to the operation of the biodigester that the Foundation was unable to pay, but the argument for tying this obligation into the breach of contract claim against the State is tenuous at best. The December 20, 2012 letter concedes that the University and Bioferm were unable to reach agreement on repayment of the debt. While the Foundation's assumption of the debt appears enforceable, the purported inclusion of the obligation under the blanket of the MOU is another matter, because the University declined to reach agreement on its alleged liability to Bioferm. Given the background of this obligation, the Court concludes that the Bioferm debt is not a public debt that can be enforced against the State in this breach of contract action.

### 3. *The Welcome and Conference Center*

Finally, the Foundation financed the construction of a welcome and conference center. Although the Foundation has not submitted a memorandum of understanding specific to this project, in a blanket June 2012 MOU signed by the Chancellor and Vice Chancellor, the University agreed

> that if revenues from projects and initiatives taken on by the Foundation are not sufficient to cover project/program expenses, the University will cover any deficit that is incurred by the Foundation in support of said projects. Furthermore, the University agrees to compensate and make whole, on an annual basis, the Foundation for any cost overruns attendant to the above referenced projects and initiatives ["property acquisition and renovation, new construction, research and curriculum enhancement programs, program expansion and new programs, and 'green' initiatives"].

12

(Docket No. 37-2 at 9.) A letter to Bank First National dated January 18, 2013 and signed by the Vice Chancellor recited that the City of Oshkosh would issue $10 million in bonds to assist the Foundation in constructing the welcome and conference center, and the bonds would be purchased by Bank First National. The University agreed that if the Foundation was unable to raise additional pledges to service the debt, it would "make the required debt service payments on the Bonds and any other liability owed by the Borrower [defined as the UW Oshkosh Foundation Alumni Welcome and Conference Center, LLC] to the Purchaser [defined as Bank First National]." (Docket No. 37-2 at 22.) The Welcome Center, LLC executed a promissory note in favor of the City agreeing to pay this debt, and the note was assigned to Bank First National. (Docket No. 37-2 at 41-43.) The Foundation guaranteed the debt. (Docket No. 37-2 at 44-48.) Here again, the University accepted responsibility for the $10 million debt, and the amount owed was easily determined at the inception of the transaction and can be readily calculated today. Counsel for Bank First National provided Mr. Cowie with a payoff figure of $5,996,463.24. (Cowie Affidavit ¶¶ 4.b. and 10.) For the same reasons that the note obligations related to the Witzel Biodigester MOU and Rosendale Biodigester MOU qualify as public debts, this obligation is a sum certain that the University unconditionally promised to pay.

       D.       Although the debt did not comply with the procedures of Chapter 18, section 18.14 validates the debt.

The State argues that it must follow procedures set forth in section 18.06 in order for debt to qualify as "public debt" as defined in section 18.01(4). Because the University did not do so in this case, the State argues the contracts are unenforceable. The Court rejects this argument, as before, because Chapter 18 of the Wisconsin Statutes contains a provision validating debt that is

otherwise "public debt" but does not comply with the relevant procedures. Section 18.14(1) provides:

> Notwithstanding any defects, irregularities, lack of power or failure to comply with any statute or any act of the commission, all public debt contracted or attempted to be contracted after December 7, 1969 is declared to be valid and entitled to the pledge made by s. 18.12; all instruments given after December 7, 1969 to evidence such debt are declared to be binding, legal, valid, enforceable and incontestable in accordance with their terms; and all proceedings taken and certifications and determinations made after December 7, 1969 to authorize, issue, sell, execute, deliver or enter into such debt or such instruments are validated, ratified, approved and confirmed.

The State again encourages the Court to read a transitional element into the statute that does not appear in its text, arguing that the provision is absurd unless it is read in this way. The State explains that after it obtained permission to incur public debt in 1969, the Wisconsin legislature adopted Chapter 18 "for the purpose of establishing the standards and procedures for selling state bonds." (Docket No. 38 at 8.) In 1973, the legislature replaced the Bond Board with the State Building Commission. According to the State, the purpose of section 18.14 was "ensuring that the debt incurred under Bond Board procedures would be honored as public debt and entitled to the protection of the pledge that Wis. Stat. § 18.12 makes—that such debt is protected by the full faith and credit of the state." (*Id.*) On the State's reading, the fact that section 18.13(2) excuses compliance with procedures a claimant would otherwise need to follow to bring an action on a claim also provides support for the idea that the legislature would not have expanded the universe of public debt to include debt contracted once the Building Commission was in place. According to the State, the legislature would not have extended the State's waiver of sovereign immunity that far.

In interpreting statutes, Wisconsin "cases generally adhere to a methodology that relies primarily on intrinsic sources of statutory meaning and confines resort to extrinsic sources of legislative intent to cases in which the statutory language is ambiguous." *State ex rel. Kalal v.*

*Circuit Court for Dane Cty.*, 2004 WI 58, ¶ 43, 271 Wis. 2d 633, 662, 681 N.W.2d 110, 123. In interpreting the statute, the Court "assume[s] that the legislature's intent is expressed in the statutory language. Extrinsic evidence of legislative intent may become relevant to statutory interpretation in some circumstances, but is not the primary focus of inquiry. It is the enacted law, not the unenacted intent, that is binding on the public." *Id.* ¶ 44. Accordingly, the Court begins with the language of the statute and ends there if the language is plain. *Id.* ¶ 45. Courts interpret statutory language in the context in which it is used, "reasonably, to avoid absurd or unreasonable results," and to give reasonable effect to every word. *Id.* ¶ 46. "If this process of analysis yields a plain, clear statutory meaning, then there is no ambiguity, and the statute is applied according to this ascertainment of its meaning." *Id.*

The State's theory as to the intent behind section 18.14 runs counter to the plain language of the statute. Section 18.14 comes near the end of the subchapter titled "State Debt," after section 18.06, which prescribes the procedures that are to be followed in contracting public debt. The text of the statute contains no temporal limitation, and the plain meaning reading of the statute as a permanent savings provision does not render the rest of the chapter irrelevant.

The State's interpretation rests entirely on speculation about what the legislature intended, and it cites no legislative history supporting its argument, nor was the Court able to locate any. There are legitimate policy reasons behind a permanent savings provision like section 18.14(1).[5] One reason would be to encourage parties to make credit available to the state by assuring them that public debt will be valid even if the State fails to comply with Chapter 18's procedures. A provision of Chapter 946 provides support for this interpretation of the statute.

---

[5] The Court adopts the reasoning it gave in denying the State's Motion for Summary Judgment. *See Univ. of Wis. Oshkosh Found., Inc. v. Bd. of Regents of the Univ. of Wis. Sys. (In re Univ. of Wis. Oshkosh Found., Inc.)*, 586 B.R. 458 (Bankr. E.D. Wis. 2018) (Docket No. 32).

15

Section 946.13(1) makes it a crime for a public officer or employee to participate in the making of a public contract in which the officer or employee has a private pecuniary interest. Section 946.13(3) voids any contract entered into in violation of the statute, except a contract creating public debt "as defined in s. 18.01 (4), if the requirements of s. 18.14 (1) have been met." Wis. Stat. § 946.13(6). Section 946.13 has been amended several times, including as recently as 2009, and various provisions of Chapter 18 have been amended numerous times. It is highly improbable that the legislature could have reviewed Chapter 18 without recognizing the alleged problems with the language of section 18.14. As the State notes, there are legitimate policy reasons behind the legislative requirements for incurring public debt, like ensuring that debt that will be repaid by Wisconsin taxpayers is incurred responsibly and for proper purposes. However, there are legitimate policy reasons supporting the enactment of a permanent savings provision, and it would be inappropriate to conclude that the plain meaning of section 18.14 is absurd. The Court will not substitute its judgment for the intent expressed in the language of the statute as the legislature enacted it.

      E.      <u>The Foundation is not a third-party beneficiary entitled to enforce alleged guaranties from the University to banks.</u>

In its briefing, the Foundation argues that it ought to be able to enforce guaranties made by the University to several banks as a third-party beneficiary to the guaranties. A party may enforce a contract to which it is not a party if the "contracting parties intended to 'directly and primarily' benefit" the third party. *Becker v. Crispell-Snyder, Inc.*, 2009 WI App 24, ¶ 11, 316 Wis. 2d 359, 367, 763 N.W.2d 192, 196. The party "proves its third-party beneficiary status by pointing to specific language in the contract establishing intent." *Id.* According to the

Foundation, the benefit it received from the alleged guaranties was that the University would pay the banks in the event the Foundation could not.

The Foundation's argument fails because the direct and primary beneficiary of the University's agreements with the banks was the banks, and the intended beneficiary of the transaction as a whole was the University and its students. The purpose of the guaranties was to induce the banks to make the bond purchases so that the Foundation could pursue a variety of projects benefitting the University. This is expressly stated in all of the guaranties, which were made in consideration of the benefits accruing to the University and its students and in pursuit of the University's educational mission. In order for a party to qualify as a third-party beneficiary, "[t]he benefit proven must be direct; an indirect benefit incidental to the primary contractual purpose is insufficient." *Id.* Although the Foundation might benefit if the University paid debt that the Foundation incurred, this is an incidental consequence of the guaranty. The main concern of the transaction was not to benefit the Foundation by ensuring its debts were paid. Rather, it was financing the projects that benefitted the University.

The Foundation cited no cases in which a principal obligor was deemed the third party beneficiary of a guaranty. The Court's research uncovered examples, but only when the guarantor agreed to waive specific rights against the principal. In *Linnemann v. Post (In re Mission Bay Ski & Bike, Inc.)*, 398 B.R. 250, 255 (Bankr. N.D. Ill. 2008), the guarantor expressly waived its subrogation and reimbursement rights against the principal, and the court found that the principal was a third party beneficiary entitled to enforce that waiver. Here, however, the University's agreements with the banks contain no specific language establishing this intent. The Foundation essentially seeks to "enforce" the guaranty on behalf of the banks, yet as the

17

State observes, the banks have filed their own actions seeking payment under the alleged guaranties. (Docket No. 38 at 11.)

F.   The Foundation may not enforce the Rosendale Biodigester Use Agreement because it is neither a party to the agreement nor a third-party beneficiary.

The Foundation also argues that it ought to be able to enforce the use agreement between the University and Rosendale Biodigester, LLC. Although it is not entirely clear from the record, apparently Rosendale Biodigester, LLC leased land for the biodigester from subsidiaries of Milk Source, LLC. (*See* Mulloy Affidavit ¶¶ 15-16.) Then Rosendale Biodigester, LLC entered into the use agreement with the University under which the University would use the biodigester "as a learning living laboratory for UW Oshkosh students, staff and guests or such other agency." (Docket No. 37-2 at 13.)[6] In exchange, the University agreed to pay a "minimum of five hundred and forty-five thousand dollars ($545,000.00) or higher to meet the Lessor's financial obligations." (*Id.*) According to the Cowie Affidavit, $158,182.01 of unpaid base rent is owed to Milk Source, presumably an obligation of Rosendale Biodigester, LLC. ¶ 9.c.

The State makes several arguments that the agreement is void under the Wisconsin Constitution. The Court need not reach these arguments because the Foundation does not have standing to enforce any rights established in the agreement. The Foundation was not a party to the agreement, and Rosendale Biodigester, LLC is not a debtor in these bankruptcy proceedings. The Foundation argues that it is a third-party beneficiary of the agreement because Rosendale Biodigester, LLC is wholly owned and controlled by the Foundation. Additionally, the Foundation asserts the facts that the University guaranteed the debt for construction of the

_____

[6] In earlier proceedings, the State submitted a Use Agreement dated October 13, 2014 with a term ending June 30, 2015. (Docket No. 28.) The State refers to this agreement in its briefing. However, the agreement filed with the instant motion is dated November 18, 2015 with a term extending into 2020 and appears to be the document on which the Foundation relies.

biodigester and entered into the Rosendale Biodigester MOU show that the University's goal was to ensure the Foundation did not incur additional expense if the biodigester was not profitable. These arguments fail because as stated in the use agreement, the University and Rosendale Biodigester, LLC, the parties to the agreement, intended to benefit the University's students by allowing them to use the biodigester for educational purposes. They did not intend to directly and primarily benefit the Foundation. Even if the Court found that the use agreement obligations could be covered under the blanket of the Rosendale MOU, the obligations are too speculative to meet the requirement of a "sum certain."

      G.    <u>The Foundation is not entitled to an award of attorneys' fees and professional fees.</u>

The Foundation initially argued that the MOU entitled it to an award of attorneys' fees and professional fees but later acknowledged that the MOU cannot support such an award and withdrew the request. (Docket No. 37-1 at 15-16; Docket No. 39 at 5.) However, the Foundation maintains that the Court can and should use its equitable powers to award fees to the Foundation. The case the Foundation cites holds that under Wisconsin law, courts may award attorneys' fees as an equitable remedy "in exceptional cases and for dominating reasons of justice." *Nationstar Mortg. LLC v. Stafsholt*, 2018 WI 21, ¶ 24, 380 Wis. 2d 284, 297, 908 N.W.2d 784, 790 (quoting *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 167 (1939)).

Even assuming *Stafsholt* permits an award of attorneys' fees in a breach of contract action such as the one here, the Foundation has not established any reason to depart from the traditional American Rule that each party to litigation is responsible for its own attorneys' fees. This is hardly a case where the State has used the court system in an attempt to "extort" something from the Foundation to which the State is not entitled. *See Stafsholt*, 2018 WI 21, ¶ 37. The conduct of the Chancellor and the Vice Chancellor in allegedly acting outside of the

19

scope of their authority by making promises to the Foundation may have been egregious, but other pending legal proceedings will determine the consequences for these former officials. This case raises novel questions about interpretation of the Wisconsin Constitution and related statutes. There is nothing egregious about the State's position that the agreements were unenforceable or its refusal to pay the Foundation substantial sums of money without a final legal determination about its obligations.

IV.    CONCLUSION

In sum, through the MOU and transactions with the Foundation and its lenders, the University created enforceable contracts to service the debt incurred by the Foundation. Because this undertaking was voluntary, unconditional and for a sum certain, the State incurred public debt through the transactions. Although the University did not follow the proper contracting procedures, the savings clause in Chapter 18 validates the contracts. Judgment for the Foundation on its breach of contract claim and an award of damages is appropriate to the extent the damages represent amounts that were readily determinable from the face of the documents comprising these transactions. According to a chart attached to the Cowie affidavit, this amount is $15,022,419.58, consisting of $7,349,956.34 for the First Business Bank loan,[7] $5,996,463.24 for the Bank First National loan, and $1,676,000.00 for the Wells Fargo loan. To the extent the MOU covered other unliquidated operating deficits, the Court concludes those are not a "sum certain" that meet the definition of public debt. Because the obligations do not constitute public debt, the savings clause of section 18.14 does not apply to protect the liability.

---

[7] The Cowie Affidavit actually gives two different totals for this obligation. This total is taken from the chart attached as Exhibit A to the Affidavit as the Affidavit states: "The amount in Exhibit A was provided to the Foundation by First Business Bank." (Cowie Affidavit at ¶ 9.a.)

The Foundation has asked the Court to direct entry of final judgment on its breach of contract claim pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, incorporated in bankruptcy proceedings by Bankruptcy Rule 7054. The rule states that "When an action presents more than one claim for relief . . . the court may direct entry of a final judgment as to one or more, but fewer than all, claims . . . only if the court expressly determines that there is no just reason for delay." In order for judgment under Rule 54(b) to be appropriate, the decision "must be a 'judgment' in the sense that it is a decision upon a cognizable claim for relief, and it must be 'final' in the sense that it is 'an ultimate disposition of an individual claim entered in the course of a multiple claims action.'" *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7 (1980) (quoting *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 436 (1956)). In determining whether there is no just reason to delay an appeal, courts consider "judicial administrative interests as well as the equities involved." *Id.* at 8. The Court agrees with the Foundation that in this adversary proceeding, there is no just reason to delay entry of a final judgment on Count I of the complaint under the provisions of Rule 54(b). The Court will enter a separate judgment consistent with this decision pursuant to Rule 58 of the Federal Rules of Civil Procedure.

Dated: August 29, 2018

By the Court:

Susan V. Kelley
Chief U.S. Bankruptcy Judge

21